**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **GRASSROOTS ANALYTICS, INC.** | |
| Plaintiff, | |
| v. | Case No. 1:25-cv-00822 (TSC) |
| **ISAIAH MARTIN FOR CONGRESS,** *et al.*, | |
| Defendants. | |

<u>**MEMORANDUM OPINION**</u>

Plaintiff Grassroots Analytics, Inc. brings this breach of contract action against Defendants Isaiah Martin for Congress and Isaiah Martin.  In 2023, Plaintiff entered into a contract with Isaiah Martin for Congress to provide fundraising services for Martin's electoral bid for Texas's 18th Congressional District in the U.S. House of Representatives.  Compl. ¶¶ 10–11, ECF 1.  Plaintiff now sues Defendants for failure to pay for those services under the terms of their Services Agreement.  *Id.* ¶¶ 2–3.  Defendants have moved to dismiss Plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction and Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.  Defs.' Mot. to Dismiss ("Defs.' Mot."), ECF No. 8.  For the reasons set forth below, the court will DENY Defendants' Motion to Dismiss.

## I.    BACKGROUND

Plaintiff Grassroots Analytics, Inc. is a consumer data company that offers services to help political candidates raise funds and connect with donors.  Compl. ¶ 6.  It is a Delaware corporation

1

with its principal office in the District of Columbia.  *Id.*  Defendant Isaiah Martin is a resident of Texas and former candidate for Texas's 2024 18th Congressional District election, and Defendant Isaiah Martin for Congress ("the Campaign") is a Texas organization formed and operated by and on behalf of Martin in connection with his campaign.  *Id.* ¶¶ 7–8.

On July 31, 2023, Plaintiff and the Campaign entered into a Services Agreement whereby Plaintiff would provide fundraising services to the Campaign for a "monthly fee (post-primary)" of "9% of [the] total amount raised from all avenues except for contributions received from political action committees, house parties, state parties, unions, labor organizations, immediate family, and in-kind contributions."  Compl. ¶¶ 10–11; Defs.' Mot., Ex. A ¶ 5(E), ECF 8-2.  Section 6 of the Services Agreement states that Plaintiff would be responsible for expenses "incurred while performing services," while the Campaign would pay the "fair market value for in-person services" as well as reimburse Plaintiff for "any pass-through expenses."  Compl. ¶ 12; Ex. A ¶ 6(A)–(C). The Services Agreement also includes a forum selection clause under which the parties agreed to "submit to the exclusive jurisdiction of, and waive any venue objections against, the United States District Court for the District of Columbia and the Superior Court of the District of Columbia, in any litigation arising out of or in connection with this Agreement."  Ex. A ¶ 15.  In addition, the Services Agreement includes a choice of law provision which dictates that its terms "will be governed by and construed under the laws of the United States and the District of Columbia."  *Id.* ¶ 21.

Martin announced his candidacy for the U.S. House of Representatives in September 2023. Compl. ¶ 14.  Pursuant to the Services Agreement, Plaintiff began a text messaging campaign on Defendants' behalf to solicit donations, as well as other services including providing access to donor lists and improving digital fundraising capabilities.  *Id.* ¶¶ 17, 20.  To perform the messaging

2

campaign, Plaintiff used a third-party vendor, Scale to Win, which billed Plaintiff $200,833.34 for its services. *Id.* ¶¶ 18, 19. In December 2023, Martin suspended his campaign. *Id.* ¶ 24. Plaintiff sent an invoice to the Campaign on December 11, 2023, for $200,833.34—the cost of Scale to Win's services. *Id.* ¶ 21. The same day, Plaintiff also sent an invoice in the amount of $24,608.03, representing 9% of the total amount raised by the Campaign. *Id.*

Plaintiff asserts that "Defendants have never paid Grassroots Analytics for any of the services provided in connection with the invoices and under the terms of the Agreement." *Id.* ¶ 22. Plaintiff also claims that, pursuant to a late fee clause in the Services Agreement, Defendants owe a 10% late fee for failure to pay the outstanding invoices. *Id.* ¶¶ 23, 30; Ex. A ¶ 5(J). Consequently, on March 19, 2025, Plaintiff filed this lawsuit alleging that Defendants breached the terms of the Services Agreement. Compl. ¶ 30. On May 20, 2025, Defendants filed a motion to dismiss, arguing (1) that the court lacks personal jurisdiction over each Defendant, and (2) that Plaintiff failed to state a claim upon which relief can be granted. Defs.' Mot. at 1.

## II.    LEGAL STANDARD

### A.  Rule 12(b)(2)

On a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of proving the "factual basis for the exercise of personal jurisdiction over the defendant." *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990). The plaintiff must allege specific acts connecting the defendant with the forum. *Second Amend. Found. v. U.S. Conf. of Mayors,* 274 F.3d 521, 524 (D.C. Cir. 2001). Bare allegations and conclusory statements are insufficient. *Id.*; *Atlantigas Corp. v. Nisource, Inc.*, 290 F. Supp. 2d 34, 42 (D.D.C. 2003). In determining personal jurisdiction, the court may receive and weigh affidavits and other relevant materials to assist in determining the jurisdictional facts.

3

*United States v. Philip Morris Inc.*, 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000).

### B. Rule 12(b)(6)

A motion under Rule 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). To overcome a 12(b)(6) motion to dismiss, the complaint must include sufficient facts that, if accepted as true, "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when the facts pleaded allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The court will presume that "well-pleaded factual allegations" are true, *id.* at 679, and "grant plaintiffs the benefit of all inferences that can be derived from the facts alleged," *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

### III.    ANALYSIS

### A. The Campaign

#### 1. Personal Jurisdiction

Plaintiff contends that personal jurisdiction over the Campaign is proper under the forum selection clause of the Services Agreement, which states: "The parties hereby submit to the exclusive jurisdiction of, and waive any venue objections against, the United States District Court for the District of Columbia and the Superior Court of the District of Columbia, in any litigation arising out of or in connection with this Agreement." Ex. A, ¶ 15. The court agrees.

A forum-selection clause "is generally considered to be a *consent* to the exercise of personal jurisdiction in a particular forum." *Sabre Int'l Sec. v. Torres Advanced Enter. Sols., LLC*, 60 F. Supp. 3d 21, 32 (D.D.C. 2014). Courts will enforce a forum selection clause unless the resisting party can show that "enforcement would be unreasonable and unjust, or that the clause

was invalid for such reasons as fraud or overreaching." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972); *see also Cheney v. IPD Analytics, LLC*, 583 F. Supp. 2d 108, 118 (D.D.C. 2008). The parties do not appear to contest that the forum selection clause applies to the Campaign or that its enforcement would be reasonable. Rather, Defendants argue that Plaintiff did not attach the Services Agreement to its Complaint. Defs.' Reply at 2, ECF 12. But this argument is unavailing, as the court may review relevant materials outside the pleadings to determine the pertinent jurisdictional facts,[1] *see Philip Morris Inc.*, 116 F. Supp. 2d at 120 n.4, and nothing in the record indicates that the forum selection clause is invalid. Consequently, the clause provides personal jurisdiction over the Campaign.

### 2. Breach of Contract Claim

Under District of Columbia law,[2] "[t]o *prevail* on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Molock v. Whole Foods Mkt., Inc.*, 297 F. Supp. 3d 114, 131 (D.D.C. 2018) (quoting *Francis v. Rehman*, 110 A.3d 615, 620 (D.C. 2015)). To overcome a Rule 12(b)(6) motion to dismiss, however, a plaintiff need only "describe the terms of the alleged contract and the nature of the defendant's breach." *Id.* (quoting *Francis*, 110 A.3d at 620). "A complaint meeting these basic requirements will survive a motion to dismiss even if it is 'imprecise or vague.'" *Pernice v. Bovim*, 183 F. Supp. 3d 84, 89 (D.D.C. 2016) (quoting *Burnett v. Am. Fed'n of Gov't Emps.*, 102 F. Supp. 3d 183, 193 (D.D.C. 2015)). That is because courts must resolve ambiguous contractual terms "by examining extrinsic

---

[1] The court may also consider the Services Agreement in resolving Defendants' 12(b)(6) challenge because the Complaint "refer[s]" to the Agreement, and it is "integral" to Plaintiff's claim. *Real World Media LLC v. Daily Caller, Inc.*, 744 F. Supp. 3d 24, 31 (D.D.C. 2024).

[2] The parties do not dispute that D.C. law governs this action.

evidence, requiring a deeper factual analysis than is permitted at the motion-to-dismiss stage." *Id.* at 87–88 (citing *District of Columbia v. D.C. Pub. Serv. Comm'n*, 963 A.2d 1144, 1155–56 (D.C. 2009). Courts have, however, granted a motion to dismiss where the breach of contract allegations are "flatly contradicted by the express terms" of the contract. *Davis v. World Sav. Bank, FSB*, 806 F. Supp. 2d 159, 172–73 (D.D.C. 2011) (granting a motion to dismiss where "there [was] only one reasonable interpretation of the [contract], and it contradict[ed] [plaintiff's] claim for breach of contract").

As noted above, Plaintiff's breach of contract claim turns on the Campaign's purported failure to pay: (1) Plaintiff's monthly fee; (2) the pass-through expenses for Scale to Win's texting campaign; and (3) the late fee associated with the Campaign's failure to timely pay the prior two invoices. *See* Compl. ¶¶ 11–12, 17–23, 30. In contesting its obligation to pay Plaintiff's monthly fee, Defendants point to language in Section 5(E) of the Services Agreement that states "Monthly Fee (post-Primary)." Defs.' Mot. at 13; Ex. A, ¶ 5(E). Defendants argue that this parenthetical indicates that Section 5(E) preconditioned any obligation to pay Plaintiff's monthly fee on Martin's success in the primary, and that condition was never triggered because Martin suspended his campaign before the primary. Defs.' Mot. at 12–13. Defendants' argument is unavailing. Notably, they fail to provide any other evidence or language in the Agreement indicating that the Campaign's monthly fee obligation was contingent on Martin's success in the primary. And while the parenthetical may indicate that the monthly fees were not *due* until after the primary, nothing in the language "Monthly Fee (post-Primary)" clearly relieves the Campaign from its duty to pay Plaintiff for services rendered.

Defendants also contend that the Campaign is not responsible for reimbursing expenses incurred by Plaintiff's use of Scale to Win's texting services because, under Section 6(C) of the

Service Agreement, reimbursements for pass-through expenses were limited to "third-party charges for goods, raw materials, and/or use of equipment," and Plaintiff was responsible for covering all expenses for performance of its "services" under Section 6(A). Defs.' Mot. at 10–12. While it is true that Section 6(A) indicates that Plaintiff "will be responsible for all expenses incurred while performing services under this Agreement," Ex. A ¶ 6A, Section 6(C) states: "Client will reimburse GA for any pass-through expenses at actual cost, which *may include* third-party charges for goods, raw materials, and/or use of equipment, that are paid directly by GA and are reasonably required by GA to provide the services pursuant to Section 3 of this Agreement." *Id.* ¶ 6(C) (emphasis added). Defendants do not contest that use of Scale to Win was "reasonably required" by Plaintiff to provide its services under the Agreement, and the term "may include" indicates that the list of examples is neither exclusive nor exhaustive. Although the examples in Section 6(C) differ in nature from the types of services rendered by Scale to Win, this section does not "flatly contradict[]" the Campaign's alleged obligation to pay the invoice for such expenditures. *Davis*, 806 F. Supp. 2d at 172.

Finally, Defendants argue that the late payment fee is invalid because it relies on the contested obligation to pay the pass-through expenses and the monthly fee invoices. Defs.' Mot. at 13. Because the court finds that terms of the Services Agreement are susceptible to multiple reasonable interpretations regarding the Campaign's other payment obligations, however, the court also finds that the terms of the Services Agreement do not, by any clear terms, controvert the Campaign's purported obligation to pay the associated late fee.

In sum, the plain language of the Services Agreement does not flatly contradict Plaintiff's interpretations of the Campaign's payment obligations, and dismissal of Plaintiff's breach of

contract claim against the Campaign is inappropriate. *Cf. Davis*, 806 F. Supp. 2d at 172–73.

### B. Martin

Plaintiff also asserts that the Services Agreement's forum selection clause applies to Martin in his individual capacity even though he was not a party to the contract. Pl.'s Opp'n at 8, ECF No. 10. First, Plaintiff argues that Martin is subject to the agreement's forum selection clause because his conduct was so "closely related" to the contractual relationship that it was foreseeable he would be bound by it. *Id.* at 8. Second, Plaintiff asserts that under an alter ego theory, there is "no meaningful difference" between the Campaign and Martin, and therefore the entire contract can be enforced against him. Compl. ¶ 16; Pl.'s Opp'n at 10. Plaintiff similarly relies on an alter ego theory of liability to hold Martin individually liable for the Campaign's payment obligations under the Services Agreement. Pl.'s Opp'n at 15–22; *see also* Compl. ¶ 16.

The court need not consider whether Martin was sufficiently "closely related" to the Services Agreement to confer personal jurisdiction through its forum selection clause because Plaintiff has alleged sufficient facts to plausibly infer that Martin is subject to the Services Agreement under an alter ego theory.

Under D.C. law, "'[t]he general rule is that a corporation is regarded as an entity separate and distinct from its shareholders.'" *Lawlor v. District of Columbia,* 758 A.2d 964, 975 (D.C. 2000) (quoting *Vuitch v. Furr,* 482 A.2d 811, 815 (D.C. 1984)). A party may nonetheless pierce the corporate veil under an alter ego theory if they can show that there is "(1) unity of ownership and interest [between the corporation and shareholders], and (2) use of the corporate form to perpetrate fraud or wrong, or other considerations of justice and equity justify it." *Estate of Raleigh v. Mitchell*, 947 A.2d 464, 470 (D.C. 2008) (cleaned up). In determining whether a corporation is an alter ego of its shareholders, courts "consider various factors, such as (1) whether corporate

formalities have been disregarded, (2) whether corporate funds and assets have been extensively intermingled with personal assets, (3) inadequate initial capitalization, and (4) fraudulent use of the corporation to protect personal business from the claims of creditors." *Id.* at 471 (internal quotations and citation omitted). In the end, however, "[t]here is no precise formula by which to predict when courts will pierce the corporate veil since each case is sui generis." *Vuitch*, 482 A.2d at 816.

Here, the Complaint alleges that the Campaign was formed and operated by and on behalf of Martin, and its sole purpose was "to support Mr. Martin in his congressional bid." Compl. ¶¶ 7, 16. The Complaint also alleges that Martin (1) "used his personal social media accounts to announce his candidacy, to promote his campaign website, and to communicate on behalf of the campaign," *id.* ¶ 15, and (2) used Campaign funds for personal travel after he dropped out of the 2024 race for Congress and had no active campaign, *id.* ¶ 25. Finally, Plaintiff points out that Martin signed the Services Agreement and that the contract was executed for his benefit. *Id.* ¶ 10. Defendants counter that Plaintiff "entirely fails to allege that the Campaign was not adequately capitalized, contains no allegations that Isaiah Martin commingled funds with the entity, and does not assert that Isaiah Martin personally made use of the Campaign to perpetuate fraud." Defs.' Mot at 21.

While it is true that "a plaintiff must allege some injustice or inequity warranting intrusion into the legally distinct identities of a corporation and its sole owner," *Motir Servs., Inc. v. Ekwuno*, 191 F. Supp. 3d 98, 110 (D.D.C. 2016), Plaintiff need not "show actual fraud perpetrated through use of the corporate form" or that the "the corporate form was *misused* to work . . . injustice or inequity," *McWilliams Ballard, Inc. v. Broadway Mgmt. Co.*, 636 F. Supp. 2d 1, 8 (D.D.C. 2009) (internal quotations and citations omitted). Plaintiff's allegations, taken as true, not only suggest

9

that Martin exercised singular and substantial control over his Campaign—which was created to support his congressional bid—but also that he used Campaign funds for personal travel after he announced he was no longer running and despite the Campaign's purported failure to pay the outstanding fees owed to Plaintiff. *See* Compl. ¶¶ 7, 16, 25. Such allegations support a sufficiently plausible inference that "there is unity of ownership and interest" between Martin and his Campaign, *McWilliams Ballard*, 636 F. Supp. 2d at 8 (internal quotations and citation omitted), and that "adherence to the fiction of the separate existence of the corporation would . . . promote injustice," *Motir Servs.*, 191 F. Supp. 3d at 109 (internal quotations and citation omitted).

Moreover, courts are generally reluctant to dismiss cases for failure to adequately plead liability under an alter ego theory before there has been an opportunity for discovery. *See Material Supply Int'l, Inc. v. Sunmatch Indus. Co.*, 62 F. Supp. 2d 13, 22–23 (D.D.C. 1999) (denying a motion to dismiss where the party had not had an opportunity for discovery to obtain evidence of an alter ego relationship); Minute Order, *Phil Ehr For Cong. Campaign Comm. v. Grassroots Analytics, Inc.*, No. 24-cv-03035 (D.D.C. Aug. 19, 2025) (denying a candidate's motion to dismiss Grassroots Analytics's counterclaim, which asserted personal jurisdiction under the closely related doctrine and an alter ego theory, for want of discovery). The Complaint's allegations suffice to sustain Plaintiff's burden at this stage of the litigation to proceed on an alter ego theory, both to establish personal jurisdiction over Martin by consent to the forum selection clause as well as to allege a plausible claim that Martin is individually liable for the Campaign's alleged breach of the Services Agreement.

## IV.    CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss is DENIED.  For the claims against Martin in his individual capacity, however, the court will deny Defendants' Motion without prejudice in the event they seek to reassert their arguments following discovery.

Date: March 27, 2026

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge

11